And our next case this morning is Carroll v. Horizon Bank. Mr. McQuarrie. Your Honor, if it pleases the court, my name is Jeff McQuarrie. I represent Plaintiff Daniel Carroll. The district court made two errors. The first error was that it found that the executive who fired Mr. Carroll, Dennis Kuhn, did not know of Carroll's advocacy for equal pay on behalf of Allison Esterly Klein. In fact, Mr. Kuhn did know about this advocacy, although he may not have known about it at the time Mr. Carroll was engaged in that advocacy. He necessarily knew about it after the fact. The second error is that the district court impermissibly made credibility determinations regarding the declaration of Cindy Presinel when she testified that the backdated memos, although incorrectly dated and placed in Mr. Carroll's file after he was fired, did in fact describe actual events. I'm going to take the credibility determinations first because those credibility impermissible determinations go to the heart of pretext. Cindy Presinel, the Horizons vice president for human resources, admits in her declaration that she backdated the three memos, each purporting to describe a meeting at which the executive vice president and she discussed alleged performance deficiencies with Mr. Carroll. She acknowledges that they were backdated and placed in Mr. Carroll's file only after he was fired, but she says that they were based on contemporaneous notes since lost and describe actual meetings. Daniel Carroll in his declaration testified that two of those three meetings never happened and that the conversation described in the third meeting never happened whether at that meeting or at any other time. The district court found that Dan Carroll's declaration contradicted his deposition testimony and therefore disregarded it. That finding was erroneous. The conversation described in this third memo in the third meeting was that Dennis Kuhn criticized Mr. Carroll for allegedly being rude and inappropriate on a conference call. In his deposition, Mr. Carroll acknowledges that a conversation about that phone call did indeed occur, but there is no contradiction because Dan Carroll very plainly testifies in his deposition that Kuhn's criticism of his conversation was as to the substance of the discussion. Dan Carroll felt that extending a loan to this company was financially improvident. Dennis Kuhn wanted the loan to go through. At no time did Dennis Kuhn tell Dan Carroll that his personal conduct or his demeanor was inappropriate and therefore there is no contradiction and the district court was wrong to disregard Dan Carroll's deposition. Those three meetings, if they occurred, are absolutely central to the pretextual reason given for Horizon to fire Dan Carroll. Those three memos describe three meetings at which Dan Carroll received in-person counseling directly from the executive vice president expressing concern about his job performance. In addition, they would constitute written warnings because when a memo is placed in an executive's file, the executive gets a copy of it or gets to see it. So if the court credits Cindy Presinel's declaration, then it is essentially acknowledging that Dan Carroll received extensive verbal and written criticism of his job performance. In fact, Dan Carroll testified that, again, two of those three meetings never happened. The memos were all written after he was fired, so he never received them, never received written notice at any time, and the conversation about his alleged rude and aggressive behavior on a phone call never happened at all. And I might add that Dennis Kuhn was totally unable to remember what Dan Carroll even allegedly said in that phone call, so there is ample reason to doubt that the Presinel memos accurately described the purported events. Everything you're talking about, though, isn't it quite separated in time from the issues that were raised about the pay of Ms. Osterly-Klein? Thank you for bringing that, Your Honor, because I think that gets to a central question. Dan Carroll's advocacy on behalf of Allison Osterly-Klein occurred in the spring, summer, and fall of 2017. That's when he first gave the idea to Human Resources in the spring, presented it to the assembled executives in the summer, in June, and was told, we like your idea, we're going to reorganize the credit department in the way you described. And in the fall, Dan is going to the Human Resources ladies, Diane Garwood and the Vice President herself, saying, Allison hasn't been given a raise yet, what's going on? And is told, well, the CEO hasn't approved the raise. Dan Carroll went to Diane Garwood and Cindy Presinel, I think he said six or seven times, in the fall. Now, we know Dennis Kuhn probably did not know about that in the fall because he was out on medical leave. But Dennis Kuhn necessarily found out about it afterwards. So when the raise doesn't go through, Allison Osterly-Klein is upset and angry, mainly at Dan for promising her a promotion that she never got. And she complains about sex discrimination to Dennis Kuhn, the Executive Vice President. Dennis Kuhn finds out about the complaint and schedules a meeting with himself, Dan Carroll, and the Vice President for Human Resources. By this time, Human Resources had found out that the entire bank believes that the credit department had been reorganized, and among others, Allison Osterly-Klein promoted, but that they, Human Resources, didn't know about it. And therefore, Allison Osterly-Klein was promoted to a position that did not exist. At this point, Dennis Kuhn, according to the memo of the Human Resources Vice President, admonishes Dan Carroll for offering Allison Osterly-Klein a raise before the formalities of the reorganization had been completed. In this conversation, it is explained by the Vice President for Human Resources that Allison Osterly-Klein is complaining of pay inequity. And in fact, we see her complaint in her email where she said that she had come to believe that no amount of talent and hard work would lead to advancement for a female at this bank. In order to address this complaint of discrimination, Dennis Kuhn authorizes Human Resources to offer Allison Osterly-Klein the very job to which Dan Carroll had attempted to promote her months earlier. So I am getting to answer your question, Your Honor. Yes, the advocacy occurred mainly in the summer and fall of 2017. Dan Carroll was fired in May 2018. But Dennis Kuhn did not learn of Dan Carroll's advocacy until late February 2018. He did not learn that Allison Osterly-Klein was so upset that she was not going to accept the peace offering promotion. He would not have learned that until April. So, in fact, Dan Carroll was fired a month, not after the advocacy, but a month after the whole situation blew up in the bank's face. Mr. McQuarrie, your time has expired. Thank you, Judge. Thank you. Mr. Cranby. Thank you, Your Honors, and may it please the Court. There's really two issues in the appeal of the summary judgment before you. One of them is what exactly did Mr. Kuhn know, and the other is whether the proffered reason for Mr. Carroll's termination is a pretext. There's no dispute that if Mr. Kuhn wasn't aware of protected activity that he couldn't have discriminated against Mr. Carroll based on activity he was unaware of. The reason we know that Mr. Kuhn didn't have this knowledge is Mr. Carroll's testimony. He admitted in his deposition that Mr. Kuhn wasn't in that position at the time of the last activity. He was asked in his deposition, when was the last time you engaged in protective activity? It wasn't quite put quite that legalistically, but that was the question. His answer was in the fall of 2017. Not 2018, not at some meeting later on, but in 2017. Mr. Carroll himself admitted that Mr. Kuhn was out of medical leave at that time. He wasn't involved in any of this process. He wasn't even a supervisor at that time. He was asked in his deposition, was there any occasion when he became aware that Mr. Kuhn knew of this alleged advocacy on behalf of Ms. Oshley Klein? And he said no. So again, the best witness on this point about Mr. Kuhn's knowledge is Mr. Kuhn himself. Is it even clear that when Mr. Carroll was raising this concern in that fall of 2017 that he was doing it in terms of gender discrimination? No, I would say it's just the opposite. We're going to come to that in a little bit, but let's hop ahead to it now. What was going on here is he was recommending a reorganization of his department, his credit department, to have three regional credit managers, two of which were going to be male employees, the third was going to be Mrs. Oshley Klein. And they were told he needed a new salary structure for this. So the idea of what Ms. Oshley Klein was going to receive as part of this package in the reorganization was about the business. It wasn't about making sure things were equal among men and women. I thought there was also something in the briefs about we not only need to bring her up to speed with the other two folks that are going to have similar managerial responsibilities just to make them equal that way, but if we don't increase her pay, there's going to be a competitor to pick her off. Yeah, in fact, that's spot on, Your Honor. A month before this meeting in June of 2017 when the reorganization kind of rolled out amongst the executives, Mr. Carroll submitted a pay increase for Ms. Oshley Klein that says nothing about inequality between men and women. What it says is that it's become an extremely employee-favorable hiring market. We're having trouble getting people in. Someone's going to poach her. The poach was coming right out of this document that said 125 and 126 of the supplemental appendix. So it's clear here if there was really advocacy on behalf of Ms. Oshley Klein, not because of business reasons or reorganization reasons, but because of inequality, that's when it would have occurred, and it didn't. That's not what happened here. In these two meetings that Mr. Prairie focuses on, the one in June of 2017, which happened just after the document I just flagged for your honor, that was a discussion of the reorganization. It wasn't a discussion of we have an inequality problem here. It was a discussion of we need to fix this department. We need to reorganize to accomplish certain things. The other meeting was in February of 2018, and again, through Mr. Carroll's own words, and this is at the supplemental appendix at 321, they weren't talking about Mr. Carroll's advocacy. They were talking about the complaint that Ms. Oshley Klein had brought up about why didn't I get the raise that I was promised by Mr. Carroll. He's the one that kind of started this by, without authority, telling the folks that they had gotten promotions, they had gotten raises, but meanwhile the company had said pump the brakes. We have to run this through the chain, and we have to have human resources look at it. We have to have the CEO sign off on it. So there's nothing in the record, including from Mr. Carroll's own words, about from that meeting that would give Mr. Kuhn any idea that he was advocating for equal pay within the company. I'll move to the pretext issue, and really the argument here is primarily about the backdated memo, so I guess I'll jump to that. Again, the best evidence about those memos comes from Mr. Carroll. His deposition, he testified that there were these meetings. He tries to contradict it in his affidavit, and I agree that that's what the record says, that these meetings in March 2018 and April 2018 didn't occur, but at the supplemental appendix 4142, where he discusses attending meetings in March or February with Mr. Kuhn and Presnell, that's consistent with what the Presnell memo says. And again, we're told that there was no meeting in April at which the tone of Mr. Carroll's behavior on this phone call, well, that's just false, and the reason I can say that is because I have Mr. Carroll's words. I'm going to quote directly from his deposition testimony. Do you recall speaking in April of 2018 with Mr. Kuhn regarding concerns about language and tone you had used on a conference call? Yes, I do. I don't remember if that was the date. I thought it was earlier than that, but you recall speaking with Mr. Kuhn about concerns he had regarding language and tone you had used on a conference call? Yes. Now, you're told today that the only discussion was about substance of the call, and that's what Mr. Carroll says in his declaration, but he can't do that. He's locked into his deposition testimony, and Judge DiGiulio properly found that in his grant of summary judgment. So on the pretext, the memos don't get there, and I think it's more important than just the contradictions that the substance of the memos are correct. We were backdated to being used a lot to try and create the pretext argument that was somehow a lie, but really what happened here is Ms. Presinel typed in her contemporaneous notes and dated them the day the meetings took place, and they say that Mr. Carroll was warned about his underperforming ways. And Mr. Carroll in his deposition agreed that that's what happened at those meetings. That's the real substance. That's what's important about those memos. But let's look at the argument that the reason for the firing is a pretext. He admits that beginning in the fall of 2017, there were numerous complaints from employees, and these were about serious things, that he was inattentive, that he wasn't managing the workloads, that they were getting overworked, that he was unappreciative, inaccessible, wouldn't return phone calls, and I think really critically that he was signing documents without them being completely filled out. One of the employees said, we have a regulatory violation occurring here, and we're really at risk. So all of these, Mr. Carroll admitted in his deposition that those were complaints that were in fact made by employees. He acknowledges that he met with Mr. Kuhn, that he was aware of these concerns, and that Mr. Kuhn had a good faith belief that all those things were true. I mean, this isn't a pretext case where the company is somehow making things up. We know the allegations are true. What Mr. Carroll has to do to prevail in those cases show that such serious allegations that we know were made by Mr. Carroll's own underlings were somehow ignored, and the real intent for Mr. Kuhn's termination decision was something he wasn't aware of that happened way back in 2017, eight months earlier. There's no factual basis for that, as Judge DiGiulio said in his summary judgment opinion. I understand the arguments, but the evidence just isn't there. And for that reason, we would ask the court to affirm Grant's summary judgment. And thank you, Your Honors. Unless there's any other questions, I'll release the rest of my time. Thank you. All right, Mr. McQuarrie, your time had expired, so the case is taken under advisement. Yes, very briefly, if you have something conclusive to say. Thank you, Your Honor. Just very quickly, Judge, in response to your question about could Kuhn have known that Mr. Carroll was advocating specifically about unequal pay as opposed to simply increasing the pay of someone that they wanted to keep at the bank, yes. At the June 2017 meeting where Dan Carroll proposed the reorganization of the credit department, he specifically said that if Alice and Esther Lee Klein were promoted to the position that he was intended for her, that she would be making substantially less than the two other men in that position and that her pay would need to be increased to their level for the purpose of pay equity. And Dennis Kuhn attended that meeting. Also, at the February— I think we have your argument. Thank you very much. Thank you, Judge.